STATE OF NORTH CAROLINA v. LEE ROY ELLISON

STATE OF NORTH CAROLINA v. JAMES EDWARD TREADWAY

No. COA10-386

(Filed 19 July 2011)

**1. Search and Seizure— stop of vehicle—multiple factors— informant's information**

The trial court did not commit plain error by denying defendant Ellison's motion to suppress drugs seized from his vehicle where defendant contended that officers stopped his truck based exclusively on insufficiently corroborated information received from an informant. The detective had ample justification for treating the information supplied by the informant as having been corroborated by subsequent events and the detective decided to stop Ellison's truck after considering a number of factors.

**2. Constitutional Law— effective assistance of counsel—failure to object—no prejudice**

The failure of trial counsel to object to the admission of challenged evidence at trial did not constitute ineffective assistance of counsel for defendant Ellison where Ellison did not make the required showing of prejudice.

**3. Discovery— identity of informant—motion to reveal denied**

The trial court did not err in a drugs prosecution by denying defendant Ellison's motion to require disclosure of an informant's identity. The detective had ample justification for stopping defendant Ellison and the denial of Ellison's request for disclosure of the informant's identity was fully consistent with N.C.G.S. § 15A-978(b).

**4. Drugs— trafficking—prescription opiates—entire weight of pills**

The trial court did not err by denying defendant Ellison's motion to dismiss drug trafficking charges where defendant contended that he lacked adequate notice that possession of prescription Lorcet pills could result in being charged with trafficking in an opiate and being responsible for the entire weight of the pills.

**5. Criminal Law— joinder of charges—other crimes**

The trial court did not abuse its discretion by joining charges against both defendants for trial where defendant Treadway argued that this decision allowed the jury to consider evidence of other crimes introduced against defendant Elliston as evidence of Treadway's guilt. Treadway did not show that he was prejudiced by the admission of evidence concerning Ellison's 2003 drug-related activities.

**6. Evidence— joined defendants—prior crimes or bad acts of one defendant—no prejudice**

There was no plain error in a drugs prosecution against joined defendants where defendant Treadway argued that the trial court should not have admitted evidence about defendant Ellison's prior possession of prescription medications. Defendant Treadway was clearly not involved in the 2003 incident, the contested evidence was relevant to guilty knowledge, the trial court gave a limiting instruction, and Treadway did not meet his burden of showing that the outcome probably would have been different absent the challenged evidence.

**7. Drugs— trafficking—evidence of possession—sufficient**

The trial court did not err by denying defendant Treadway's motion to dismiss charges of trafficking in prescription drugs for insufficient evidence of possession. Defendant argued that the State's evidence was highly suspicious but did not suffice to permit a reasonable juror to conclude that he ever actually possessed or transported or sold any drugs; however, there was clear testimony that a witness gave prescription medications to Treadway and returned later for payment, and prescription drugs matching those described by the witness were found in the vehicle of Treadway's accomplice.

**8. Drugs— trafficking—prescription medications—opiates— statutes providing punishment**

The trial court did not err by denying defendants' motions to dismiss charges of trafficking in opium and conspiracy to traffic in opium on the grounds that the medications at issue were not proscribed under N.C.G.S. § 90-95(h)(4). The General Assembly drafted N.C.G.S. § 90-95(h) for the purpose of punishing acts of drug trafficking in specific controlled substances at the level specified in N.C.G.S. § 90-95(h) regardless of the extent to which those same activities would also be subject to punishment under other provisions of N.C.G.S. § 90-05.

**9. Evidence— trafficking in prescription drugs—evidence that drugs contained opium**

The trial court did not abuse its discretion in a prosecution for trafficking in prescription drugs by admitting testimony from an SBI agent on rebuttal that dihydrocodeinone and hydrocodone contained opium.

**10. Sentencing— clerical error—remanded**

A prosecution for trafficking in prescription drugs was remanded for correction of a clerical error that had no impact upon the sentence.

Appeal by defendants from judgments entered 9 October 2009 by Judge Anderson D. Cromer in Ashe County Superior Court. Heard in the Court of Appeals 13 October 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Brandon L. Truman and Assistant Attorney General Robert D. Croom, for the State.*

*Megerian & Wells, by Jonathan L. Megerian and Franklin E. Wells, Jr., for Ellison.*

*Daniel F. Read, for Treadway.*

ERVIN, Judge.

Defendants appeal from judgments entered by the trial court sentencing James Edward Treadway (Treadway) to a minimum term of 225 months and a maximum term of 279 months imprisonment in the custody of the North Carolina Department of Correction based on his convictions for trafficking in 28 grams or more of opium by posses-

sion, trafficking in 28 grams or more of opium by delivery, and conspiring to traffic in 28 grams or more of opium by possession, and sentencing Lee Roy Ellison (Ellison) to a minimum term of 225 months and a maximum term of 279 months imprisonment in the custody of the North Carolina Department of Correction based on his convictions for trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by transportation, conspiring to traffic in 28 grams or more of opium by possession, and possession of a controlled substance.

On appeal, Treadway argues that the trial court erred in joining the Defendants' cases for trial, allowing the admission of evidence concerning Ellison's 2003 drug convictions, and denying his motion to dismiss for insufficiency of the evidence. In addition, Ellison argues that the trial court erred by denying his motion to suppress evidence and require disclosure of an informant's identity and his motion that the charges lodged against him be dismissed on constitutional grounds. Finally, both Defendants argue that the trial court erred by denying their motions to dismiss on the grounds that the conduct underlying their convictions was not covered by the statutory provisions applicable to drug trafficking and by permitting Special Agent Amanda Motsinger of the State Bureau of Investigation to present rebuttal testimony concerning the composition of the drugs in which Defendants allegedly trafficked. After careful consideration of Defendants' challenges to the trial court's judgments in light of the record and the applicable law, we conclude that no error of law occurred during the proceedings leading to the entry of the trial court's judgments and that Defendants are not entitled to any relief from those judgments on appeal.

## I. Factual Background

### A. Substantive Facts

#### 1. State's Evidence

In late July 2008, a confidential informant spoke with Detective Grady Price of the Ashe County Sheriff's Office and informed him of the existence of an ongoing arrangement between John Shaw and Defendants involving trading in prescription medications. According to the informant, Mr. Shaw, who possessed a valid prescription for hydrocodone, routinely sold that drug to Treadway, who, in turn, transferred it to Ellison. The informant described the transactions in question as recurring in nature, and stated that, typically, Mr. Shaw would fill his prescription for hydrocodone, drive to Treadway's resi-

dence, deliver the hydrocodone to Treadway, and either remain at the residence or leave for a short period of time while Treadway drove to Ellison's place of business and effectuated the final transfer of the hydrocodone to Ellison. After delivering the hydrocodone to Ellison, Treadway would return to his residence and pay Mr. Shaw for the hydrocodone. The informant told Detective Price that this sequence of events represented a change from the parties' prior method of exchange, in which Ellison would join Mr. Shaw and Treadway at Treadway's residence for the purpose of conducting these transactions.

Based upon this information, Detective Price obtained a drug profile concerning Mr. Shaw from the CVS pharmacy at which Mr. Shaw generally had his prescriptions filled and learned that Mr. Shaw had been prescribed a substantial amount of hydrocodone and Xanax each month and that he had last filled his prescriptions on or about 6 July 2008. In response to a law enforcement request, a CVS employee notified Detective Price the next time Mr. Shaw called in to have these prescriptions filled and provided him with an approximate pickup time.

On 5 August 2008, Detective Price, along with two other law enforcement officers, placed the CVS store under surveillance and observed Mr. Shaw pull into the CVS parking lot, obtain his prescription medications at the pharmacy's drive-through window, and drive directly to Treadway's residence. The investigating officers watched Mr. Shaw enter and then depart from Treadway's residence. Shortly thereafter, Ellison arrived at and then departed from the same location. After Ellison left Treadway's residence, Detective Price stopped his truck and obtained Ellison's consent to a search of his vehicle. In the course of searching Defendant's vehicle, officers found two prescription pill bottles from which the labels had been removed. The pills contained in the bottles seized from Ellison's vehicle were sent to the State Bureau of Investigation for analysis.

Special Agent Motsinger, a forensic chemist, testified that the two bottles confiscated from Ellison's vehicle contained 90 hydrocodone[1] pills, which weighed a total of 75.3 grams, and 80 alprazolam[2] tablets, which weighed a total of 10 grams. In her rebuttal testimony, Special

---

1. Special Agent Motsinger testified that hydrocodone is a generic form of the name-brand drug Lorcet and stated on multiple occasions that hydrocodone and Lorcet contain the same drug.

2. Special Agent Motsinger testified at trial that alprazolam is a generic form of the name-brand drug Xanax, and specifically stated that alprazolam and Xanax are simply two names for the same drug.

Agent Motsinger testified that both hydrocodone and dihydrocodeinone, which is a chemical compound in which hydrocodone is mixed with acetaminophen, were opium derivatives.

### 2. Ellison's Evidence

Ellison testified that he had obtained the Lorcet and Xanax seized at the time investigating officers stopped his truck on 5 August 2008 as a result of the fact that these medications had been prescribed for him by his physician. Ellison visited Treadway on 5 August 2008 in response to Treadway's request that Ellison make him a loan so that he could pay his electric bill. As a result, Ellison went to Treadway's residence and gave him $100.00. Ellison denied any knowledge that Lorcet pills contained opium.

### B. Procedural History

On 5 August 2008, warrants for arrest were issued charging Ellison with trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by transportation, conspiring with Treadway and Mr. Shaw to traffic in 28 grams or more of opium by possession, and possession of Xanax with the intent to sell or deliver. On 6 October 2008, the Ashe County grand jury returned bills of indictment charging Ellison with trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by transportation, conspiring with Treadway and Mr. Shaw to traffic in 28 grams or more of opium by possession, and possession of alprazolam with the intent to sell and deliver. On the same date, the Ashe County grand jury returned bills of indictment charging Treadway with trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by delivery, conspiring with Ellison and Mr. Shaw to traffic in 28 grams or more of opium by possession, and conspiring with Defendant Ellision and Mr. Shaw to deliver alprazolam. Prior to trial, Ellison filed motions seeking to have certain evidence seized as a result of the stopping of his vehicle suppressed and the identity of the informant disclosed and to have the trafficking charges dismissed on the grounds that convicting him for violating the trafficking statutes on the basis of the facts at issue here would violate his constitutionally protected rights to due process and to be free from cruel and unusual punishment. After hearing the evidence and arguments of counsel on 16 March 2009, Judge Edwin Wilson, Jr., denied Ellison's motions.

The charges against Defendants came on for trial before the trial court and a jury at the 5 October 2009 criminal session of the Ashe

County Superior Court. On 9 October 2009, the jury returned verdicts convicting Treadway of trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by delivery, and conspiracy to traffic in 28 grams or more of opium by possession and convicting Ellison of trafficking in 28 grams or more of opium by possession, trafficking in 28 grams or more of opium by transportation, conspiracy to traffic in 28 grams or more of opium by possession, and possession of alprazolam. The trial court consolidated Ellison's convictions for judgment, sentenced him to a minimum term of 225 months and a maximum term of 279 months imprisonment in the custody of the North Carolina Department of Correction, and ordered him to pay a $500,000.00 fine. Similarly, the trial court consolidated Treadway's convictions for judgment, sentenced him to a minimum term of 225 months and a maximum term of 279 months imprisonment in the custody of the North Carolina Department of Correction, and ordered him to pay a $500,000.00 fine. Both Defendants noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

### A. Ellison's Individual Arguments

#### 1. Denial of Motion to Suppress and Disclose Informant's Identity

[1] On appeal, Ellison initially argues that the trial court erred by denying his motion to suppress evidence seized from his vehicle on 5 August 2008 and to have the identity of the informant who provided investigating officers with information concerning his alleged involvement in drug-related activities disclosed. More specifically, Ellison contends that the investigating officers stopped his truck based exclusively on insufficiently corroborated information received from an informant whose reliability had not been adequately established during the course of the investigation into Defendants' activities and that disclosure of the confidential informant's identity should have been required in order to permit him to adequately litigate his suppression motion. We disagree.

##### a. Validity of Investigative Detention

As a result of the fact that Ellison did not object to the admission of the evidence in question at trial, we review the denial of his suppression motion utilizing a "plain error" standard of review.[3] "Plain

---

[2] 3. Ellison argues that the failure of his trial counsel to object to the admission of the challenged evidence at trial constituted ineffective assistance of counsel. Assuming that this argument is properly before us, we conclude that it lacks merit. In

error is an error that is 'so fundamental as to result in a miscarriage of justice or denial of a fair trial.' " *State v. Cunningham*, 188 N.C. App. 832, 835, 656 S.E.2d 697, 699 (2008) (quoting *State v. Bishop*, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997)). In order to establish "plain error," Ellison is required to show " 'not only that there was error, but that absent the error, the jury probably would have reached a different result.' " *Id.* (quoting *State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498, 121 S. Ct. 582 (2000)).

In order to conduct a lawful investigatory detention, investigating officers must have a reasonable suspicion that criminal activity is in progress based on specific and articulable facts and reasonable inferences drawn from those facts. *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 70 (1994) (stating that "[a]n investigatory stop must be justified by 'a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity' ") (quoting *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 362, 99 S. Ct. 2637, 2641 (1979)). Information supplied by informants may help support a determination that an investigating officer had the reasonable suspicion necessary to justify an investigatory detention. *Adams v. Williams*, 407 U.S. 143, 147, 32 L. Ed. 2d 612, 617-18, 92 S. Ct. 1921, 1924 (1972). "It is well settled that 'information given by one officer to another is reasonably reliable information' " for the purpose of supporting a search or seizure. *State v. Thomas*, 127 N.C. App. 431, 433, 492 S.E.2d 41, 42 (1997) (quoting *State v. Matthews*, 40 N.C. App. 41, 44, 251 S.E.2d 897, 900 (1979)). A careful review of the record demonstrates that, at the time he stopped Ellison's vehicle, Detective Price had the reasonable suspicion required to justify that investigatory detention.

Detective Price decided to stop Ellison's truck after considering a number of factors, including both information supplied by an informant and information developed in the course of his own investigative activities. The informant told Detective Price that Mr. Shaw had been prescribed hydrocodone and Xanax for a medical condition; that, after having his prescriptions filled, Mr. Shaw would immedi-

order to obtain relief on ineffective assistance of counsel grounds, Ellison must demonstrate both that he received deficient representation from his trial counsel and that there is a reasonable probability that the result at trial would have been different had he been properly represented. *Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068 (1984). As a result of the fact that Ellison has failed to establish that his suppression motion had merit, he has failed to make the required showing of prejudice, a fact that inexorably leads to the conclusion that his ineffectiveness claim lacks merit.

ately take his medications to Treadway's residence, where he sold the medications to Treadway; and that Treadway subsequently sold some or all of the medications to Ellison. Subsequently, Detective Price learned in the course of investigating the validity of the informant's allegations that Mr. Shaw had a prescription for Lorcet and Xanax, observed Mr. Shaw fill these prescriptions, and followed Mr. Shaw from the pharmacy to Treadway's residence. At that point, Detective Price watched Mr. Shaw enter and then exit Treadway's residence. A few minutes later, Detective Price observed Ellison arrive at Treadway's residence. In addition to the information supplied by the informant and the result of his own investigation, Detective Price considered the activities occurring at Ellison's place of employment[4], which were consistent with activities he had personally seen at other establishments at which drug-related activities occurred. According to Detective Price, his own observations and the results of an independent investigation were essentially consistent with the information provided to him by the informant.

The discrepancies between the information provided by the informant and the information that Detective Price obtained as the result of his own investigative activities should not obscure the fact that Detective Price's observations and the information supplied by the informant were generally consistent and that Detective Price had ample justification for treating the information supplied by the informant as having been corroborated by subsequent events. Moreover, despite the fact that Detective Price had not had any contact with the informant prior to this incident, one of Detective Price's co-workers, Sergeant Dennis Anders, had previously worked with the informant and found the informant to be reliable. According to Sergeant Anders, information provided by the informant on previous occasions had resulted in arrests. As a result of his conversations with Sergeant Anders and his own observations on 5 August 2008, Detective Price had a sufficient basis for assessing the informant's reliability. Based on the multitude of factors that contributed to Detective Price's decision to stop Ellison's truck, which consisted of considerably more than the information provided by the informant, we conclude that the trial court did not err, much less commit plain error, by denying Ellison's motion to suppress the evidence seized as a result of the 5 August 2008 stop of his vehicle.

---

4. These surveillance activities were conducted over the course of a six-day period and had been initiated in response to reports that drug-related activities were occurring at Ellison's place of employment.

STATE v. ELLISON

[212 N.C. App. 300 (2011)]

## b. Disclosure of Informant's Identity

**[3]** In addition, the trial court did not err by denying Ellison's motion to require disclosure of the informant's identity. N.C. Gen. Stat. § 15A-978(b) provides, in pertinent part, that:

> (b) In any proceeding on a motion to suppress evidence pursuant to this section in which the truthfulness of the testimony presented to establish probable cause is contested and the testimony includes a report of information furnished by an informant whose identity is not disclosed in the testimony, the defendant is entitled to be informed of the informant's identity unless:
>
> > (1) The evidence sought to be suppressed was seized by authority of a search warrant or incident to an arrest with warrant; or
> >
> > (2) There is corroboration of the informant's existence independent of the testimony in question.

As we explained in *State v. Bunn*, 36 N.C. App. 114, 116, 243 S.E.2d 189, 190, *disc. review denied*, 295 N.C. 261, 245 S.E.2d 778-79 (1978), the inquiry required by N.C. Gen. Stat. § 15A-978(b) relates to the informant's existence, not his or her reliability. Ellison has not contested the informant's existence either at trial or on appeal. In addition, the record contains ample evidence corroborating the informant's existence. In *Bunn*, we found that an informant's existence was sufficiently corroborated when a second officer other than the informant's primary contact testified to "such things as the [primary] officer's prediction to others of certain events of which he could not personally know, accompanied by a declaration that his informant has told him so." *Bunn*, 36 N.C. App. at 116, 243 S.E.2d at 190-91. In this case, Detective Diane Hale testified that Detective Price had told her about information that he had gained from a "tipster" regarding an illegal drug transaction and that she confirmed the truth of such information through her own investigation. As a result, given that Detective Price had ample justification for stopping Ellison and that the denial of Ellison's request for disclosure of the informant's identity was fully consistent with N.C. Gen. Stat. § 15A-978(b), we conclude that Ellison's first challenge to the trial court's judgment lacks merit.

## 2. Constitutional Challenges to the Trafficking Statutes

**[4]** Secondly, Ellison contends that the trial court erred by denying his motion to dismiss the trafficking charges on the grounds that a trafficking conviction stemming from the facts at issue would

infringe upon his constitutional rights to due process and freedom from cruel and unusual punishment. In support of this argument, Defendant contends that he lacked adequate notice that "possession of prescription Lorcet pills could result in being charged with trafficking in an opiate and being responsible for the entire weight of the pills" and because punishment under the trafficking statutes on the basis of the facts contained in the present record would be grossly unfair given the relatively small amount of controlled substance contained in the medications involved in the trafficking charges before the trial court in this case. We disagree.

In *State v. McCracken*, 157 N.C. App. 524, 526, 579 S.E.2d 492, 494 (2003), the defendant argued that the "trial court should have allowed her motion to dismiss the trafficking charges [under N.C. Gen. Stat. § 90-95(h)(4)] because, of the 5.4 grams of Oxycontin sold[], only 1.6 grams consisted of the controlled substance oxycodone." The defendant in *McCracken* contended that, "because the remaining ingredients in each tablet consisted of filler substances, their weight should not have counted toward the four grams or more charged in the indictment." *Id.* The defendant attempted to differentiate the facts of her case from those at issue in *State v. Jones*, 85 N.C. App. 56, 68, 354 S.E.2d 251, 258 (stating that, "[c]learly, the legislature's use of the word 'mixture' establishes that the total weight of the dosage units . . . is sufficient basis to charge a suspect with trafficking"), *disc. review denied*, 320 N.C. 173, 358 S.E.2d 62, *cert. denied*, 484 U.S. 969, 98 L. Ed. 2d 404, 108 S. Ct. 465 (1987), by arguing that "prescription medication in tablet form should be treated differently." *McCracken*, 154 N.C. App. at 527, 579 S.E.2d at 494. On appeal, we rejected the defendant's argument, concluding that "the language 'or any mixture containing such substance' presents a catch-all provision for any variation in form, weight, or quantity of the controlled substance and does not lead to the conclusion that the Legislature did not intend to include tablets within the definition of 'mixture.' " *Id.* at 528, 579 S.E.2d at 495. As a result, *McCracken* clearly indicates that liability for trafficking cases involving prescription medications hinges upon the total weight of the pills or tablets in question instead of the weight of the controlled substance contained within those medications, depriving Ellison's "lack of notice" argument of any merit.

Ellison's "substantive unfairness" challenge to the application of the trafficking statutes to the facts of this case hinges upon the assertion that finding someone guilty of trafficking based upon the pos-

STATE v. ELLISON

[213 N.C. App. 300 (2011)]

session of a small amount of actual controlled substances would be "grossly disproportionate," "exceedingly unusual," and offend the "public sense of fair play." We addressed a closely related argument advanced in connection with a challenge to a conviction for trafficking in cocaine in violation of N.C. Gen. Stat. § 90-95(h)(3) in *State v. Tyndall*, 55 N.C. App. 57, 60-61, 284 S.E.2d 575, 577 (1981), in which the defendant argued that construing the relevant statutory language so as to base the required weight determination on the total weight of a mixture containing a controlled substance as compared to the actual weight of the controlled substance contained in the mixture produced an unfair and illogical result. Although we expressed some sympathy for this argument, we ultimately rejected the defendant's claim because:

> Defendant . . . overlooks the purpose behind [N.C. Gen. Stat. §] 90-95(h)(3)(a) of deterring "trafficking" in controlled substances. Our legislature has determined that certain amounts of controlled substances and certain amounts of mixtures containing controlled substances indicate an intent to distribute on a large scale. Large scale distribution increases the number of people potentially harmed by use of drugs. The penalties for sales of such amounts, therefore, are harsher than those under [other statutes].

*Id.* Similarly, in *State v. Perry*, 316 N.C. 87, 101-02, 340 S.E.2d 450, 459 (1986), the Supreme Court stated, in the context of a challenge to the trafficking in heroin statute, that "the imposition of harsher penalties for the possession of a mixture of controlled substances with a larger mixture of lawful materials has a rational relation to a valid State objective, that is, the deterrence of large scale distribution of drugs." *See also State v. Conway*, 194 N.C. App. 73, 82, 669 S.E.2d 40, 46 (2008) (stating that, "if the General Assembly had chosen to define the quantity of methamphetamine needed to constitute trafficking as 28 grams or more and added, as it did in other sections of the trafficking statute, the disjunctive clause 'or any mixture containing such substance,' the total weight of the liquid found with detectable amounts of methamphetamine would be sufficient to establish a violation of" the trafficking in methamphetamine statutes), *disc. review denied*, 363 N.C. 132, 673 S.E.2d 665 (2009). In view of the fact that the ultimate responsibility for determining the manner in which criminal offenses should be punished lies with the General Assembly and the fact that there is a rational basis for subjecting individuals involved in large scale distribution of mixtures containing controlled

substances to more severe punishment, we conclude that the application of the trafficking statutes to the facts of this case does not violate the constitutional provisions upon which Ellison relies.

## B. Treadway's Individual Arguments

### 1. Joinder of Defendants

[5] On appeal, Treadway argues that the trial court erred by granting the State's motion to join the charges against both Defendants for trial. On appeal, Treadway argues that the trial court's decision to join the cases against both Defendants for trial resulted in a situation in which the jury was allowed to consider "other crimes" evidence introduced against Ellison as evidence of his own guilt. We disagree.

Joinder of charges against multiple defendants for trial is governed by N.C. Gen. Stat. § 15A-926(b)(2), which provides that:

Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

a. When each of the defendants is charged with accountability for each offense; or

b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

1. Were part of a common scheme or plan; or

2. Were part of the same act or transaction; or

3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

In cases in which "each defendant is sought to be held accountable for the same crime or crimes[,]" "public policy strongly compels consolidation [of trials] as the rule rather than the exception." *State v. Nelson*, 298 N.C. 573, 586, 260 S.E.2d 629, 639 (1979), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282, 100 S. Ct. 1867 (1980)).

The decision to grant or deny a joinder motion is committed to the "sound discretion of the trial [court]" and will not be disturbed on appeal "[a]bsent a showing that [] defendant[s were] deprived of a fair trial by [the fact of] joinder." *State v. Paige*, 316 N.C. 630, 641, 343 S.E.2d 848, 855 (1986) (citing *State v. Hayes*, 314 N.C. 460, 334 S.E.2d 741 (1985) and quoting *Nelson*, 298 N.C. at 586, 260 S.E.2d at 640). "A

defendant may be deprived of a fair trial where evidence harmful to the defendant is admitted which would not have been admitted in a severed trial." *State v. Wilson,* 108 N.C. App. 575, 589, 424 S.E.2d 454, 462 (citing *State v. Lowery,* 318 N.C. 54, 61, 347 S.E.2d 729, 735 (1986)), *disc. review denied,* 333 N.C. 541, 429 S.E.2d 562-63 (1993). However, "[i]t is not uncommon where two defendants are joined for trial that some evidence will be admitted which is not admissible as against both defendants," leading "[o]ur Courts [to] recognize[] that 'limiting instructions ordinarily eliminate any risk that the jury might have considered evidence competent against one defendant as evidence against the other.' " *Id.* at 583, 424 S.E.2d at 458 (quoting *Paige,* 316 N.C. at 643, 343 S.E.2d at 857). As a result, the presentation of evidence admissible to prove the guilt of only one of multiple defendants whose guilt is being considered in the context of a joint trial will not, without more, render the joinder of multiple defendants for trial inappropriate.

> If we were to agree with the defendant [] that the introduction of [evidence admissible against only one of the defendants joined for trial] required a severance of the defendants' trials, we would in effect be ruling that co-defendants may not be joined for trial in this state. It would be unusual for all evidence at a joint trial to be admissible against both defendants, and we often rely on the common sense of the jury, aided by appropriate instructions of the trial judge, not to convict one defendant on the basis of evidence which relates only to the other.

*Paige,* 316 N.C. at 643, 343 S.E.2d at 856-57.

Although he argues in favor of a contrary result, Treadway has not shown that he was prejudiced by the admission of evidence concerning Ellison's 2003 drug-related activities. Former Detective Christopher Miller testified that Ellison's residence was searched by law enforcement officers in 2003, that "multiple prescription bottles" that did not belong to him or any occupant of the residence were discovered during the search, and that a bottle containing 59 prescription Xanax pills and bearing the name of a third party was seized from Ellison's person. In addition, the State cross-examined Ellison in an attempt to confirm Detective Miller's account of the 2003 incident. Although he admitted that he had been convicted of possessing marijuana with the intent to manufacture, sell, and deliver in 2004 based upon the 2003 incident in the course of cross-examination, Ellison answered the State's inquiries in an evasive manner and never directly admitted to having engaged in any criminal activities involving pre-

scription medications in 2003. The State's questioning clearly established that this 2004 conviction stemmed from the 2003 search. When asked on cross-examination if "Mr. Treadway was[] involved in [the 2003 incident] in any way," Detective Miller replied "No, sir." After allowing the admission of this evidence, to which Treadway never objected, the trial court gave an appropriate limiting instruction describing the purposes for which the jury was permitted to consider evidence concerning this 2003 incident in deciding the issues under consideration in this case.

At bottom, Treadway's challenge to the trial court's decision to allow the State's joinder motion consists of little more than an argument that, since Treadway "had nothing to do with [the 2003 incident,]" the admission of evidence concerning those events "prevented him from receiving a fair trial." As we read the controlling case law, however, Treadway must do more than merely establish that evidence which was inadmissible against him was admitted for use against Ellison. *Paige*, 316 N.C. at 642, 343 S.E.2d at 856-57. Instead, Treadway must demonstrate that he was actually prejudiced by the admission of the testimony in question. In view of the fact that the evidence in question involved an incident in which Treadway was clearly not involved and the fact that the trial court gave an appropriate limiting instruction relating to this evidence, we conclude that Treadway has simply failed to make the required showing of prejudice in this instance.

Although Treadway attempts to analogize the present case to *Wilson*, in which we held that the trial court erred by allowing joinder when one defendant was charged with several offenses in which the co-defendant was not involved, resulting in a situation in which the co-defendant had to "sit through the testimony of eleven witnesses and two and one-half days of trial before any evidence was received as against him," *Wilson*, 108 N.C. App. At 589, 424 S.E.2d at 462, we do not find this comparison persuasive. In *Wilson*, evidence admissible against only one of the two defendants was presented over the course of multiple days and through the testimony of numerous witnesses. The evidence concerning the 2003 incident presented at Treadway's trial was contained in a portion of the testimony provided by two witnesses, whose discussion of this particular issue lasted only a matter of minutes instead of hours or days. In view of the differences in the scope and duration between the evidence at issue in *Wilson* and the evidence at issue here, we are unable to conclude that *Wilson* necessitates a decision in Treadway's favor with respect to the joinder issue. As a result, we conclude that the trial

court did not abuse its discretion by granting the State's motion to join the charges against both Defendants for trial.

## 2. Ellison's 2003 Drug-Possession Related Incident

[6] Secondly, Treadway argues that the trial court erred by allowing the admission of evidence concerning Ellison's possession of prescription medications in 2003 into evidence. According to Treadway, the challenged evidence was "irrelevant and its probative value was outweighed by its prejudicial effect." As a result of the fact that Treadway, unlike Ellison, did not object to the introduction of this evidence at trial, his challenge to the trial court's failure to exclude the evidence in question is subject to "plain error" review. As we have already noted, "plain error" is an error that is so significant that it results in the denial of a fair trial, or relates to something so basic, so prejudicial, so lacking in its elements that justice could not have been done. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). Defendant is not entitled to relief on appeal based upon this contention.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b). However, evidence of other crimes, wrongs, or acts may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." *Id.* Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Thus, evidence that Ellison possessed prescription drugs in 2003 would be admissible in the event that it was relevant for some purpose other than showing his propensity to engage in unlawful conduct. *State v. Lofton*, 193 N.C. App. 364, 371, 667 S.E.2d 317, 322 (2008) (quoting *State v. Bagley*, 321 N.C. 201, 206-07, 362 S.E.2d 244, 247 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912, 108 S. Ct. 1598 (1988)).

At trial, the trial court found that the challenged evidence was admissible under N.C. Gen. Stat. § 8C-1, Rule 404(b) for the limited "purposes of [proving] motive, opportunity, intent, plan, knowledge, identity, absence of mistake, [and] absence of accident." In order to obtain a conviction for a trafficking offense, the State must prove that a defendant knowingly possessed or otherwise dealt with the controlled substance at issue in that case. *State v. Weldon,* 314 N.C. 401, 403, 333 S.E.2d 701, 702 (1985). Where, as here, " 'guilty knowledge is

an essential element of the crime charged, evidence may be offered of such acts or declarations of the accused as tend to establish the requisite guilty knowledge, even though the evidence reveals the commission of another offense by the accused.'" *Id.* at 406, 333 S.E.2d at 704 (quoting *State v. McClain*, 240 N.C. 171, 175, 81 S.E.2d 364, 367 (1954). In *Weldon*, the Supreme Court upheld the admission of evidence in a trafficking case to the effect that controlled substances had been discovered at the defendant's residence on two occasions other than the one underlying the charges for which the defendant was on trial. *Id.* at 411, 333 S.E.2d at 707. In rejecting the defendant's challenge to the admission of this evidence, the Supreme Court found that the "challenged evidence [was] probative of defendant's guilty knowledge in connection with the crime for which she was being tried[, insofar as] [t]he likelihood of defendant's knowledge of the drugs at her premises increases as the instances of discovery of drugs there accumulate." *Id.* at 406-07, 333 S.E.2d at 705-06. We find the facts of *Weldon* analogous to those at issue here and distinguishable from those in *State v. Carpenter*, 361 N.C. 382, 391-92, 646 S.E.2d 105, 112 (2007) (holding that the similarities between a cocaine sale in 1996 and an incident involving the possession of cocaine alleged to be intended for sale in 2004 were not sufficiently similar to permit the admission of evidence concerning the earlier incident during a trial addressing the issue of the defendant's guilt of possession with intent to sell or deliver arising from the 2004 incident),[5] upon which Treadway relies, and thus reject Treadway's contention that the challenged evidence was only relevant "to show Ellison's propensity for illegal drug possession."[6]

---

5. Among other things, the time lapse at issue in *Carpenter* was materially greater than the one at issue here. In addition, the facts surrounding the 2003 incident, in which Ellison possessed medication bottles that had originally been prescribed for third parties, were much more similar to the facts relating to the charges for which Ellison was on trial than was the case with respect to the facts at issue in *Carpenter*. Finally, the State sought to obtain admission of the evidence at issue in *Carpenter* for the purpose of showing intent, while the evidence at issue here was admitted for a range of different purposes, including proof of guilty knowledge. As a result, we do not believe that the Supreme Court's decision in *Carpenter* necessitates a determination that the admission of evidence concerning the 2003 incident violated the strictures of N.C. Gen. Stat. § 8C-1, Rule 404(b).

6. In seeking to persuade us of the merits of this contention, Treadway does little more than restate the arguments that he advanced in connection with his challenge to the trial court's decision to join the charges against both Defendants for trial. Having already rejected that argument in the joinder context, we see no need to reiterate our reasons for rejecting that argument in detail again. We do, however, note that the record clearly established that Treadway was not involved in Ellison's controlled-substance related activities in 2003 and that the trial court clearly instructed

STATE v. ELLISON

[213 N.C. App. 300 (2011)]

Having determined that the contested evidence was relevant for one of the purposes expressly authorized by N.C. Gen. Stat. § 8C-1, Rule 404(b), we now turn to the issue of whether the challenged evidence was subject to exclusion under N.C. Gen. Stat. § 8C-1, Rule 403, which provides that, even though relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Lofton*, 193 N.C. App. at 371, 667 S.E.2d at 322 (explaining that, " 'once a trial court has determined th[at] evidence is admissible under Rule 404(b), the court must still decide whether there exists a danger that unfair prejudice substantially outweighs the probative value of the evidence.' ") (quoting *State v. Stevenson*, 169 N.C. App. 797, 800, 611 S.E.2d 206, 209 (2005)). " 'Whether or not to exclude evidence under Rule 403 of the Rules of Evidence is a matter within the sound discretion of the trial court and its decision will not be disturbed on appeal absent a showing of an abuse of discretion.' " *State v. Cunningham*, 188 N.C. App. 832, 836-37, 656 S.E.2d 697, 700 (2008) (quoting *State v. McCray*, 342 N.C. 123, 131, 463 S.E.2d 176, 181 (1995). Assuming that we are entitled to consider this argument on the merits in a plain error context, *Id.* at 837, 656 S.E.2d at 700 (stating that "we do not apply plain error 'to issues which fall within the realm of the trial court's discretion' ") (quoting *State v. Steen*, 352 N.C. 227, 256, 536 S.E.2d 1, 18 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997, 121 S. Ct. 1131 (2001)), we find that the trial court did not abuse its discretion by admitting the challenged evidence given the fact that Treadway was clearly not involved in the 2003 incident, the fact that the challenged evidence was clearly relevant to the knowledge issue in Ellison's case, and the fact that the trial court gave an adequate limiting instruction to the jury. As a result, we conclude that Treadway has failed to carry his burden of demonstrating that the trial court erred by admitting evidence concerning the 2003 incident involving Ellison or that, "absent the erroneous admission of the challenged evidence, the jury probably would not have reached its verdict of guilty." *Id.* at 835, 656 S.E.2d at 699-700. Thus, we conclude that Treadway's challenge to the admission of the challenged evidence lacks merit.

---

the jury concerning the purposes for which the challenged evidence was admissible, a set of facts that makes it difficult for us to see how any error that the trial court may have committed in admitting evidence concerning Ellison's 2003 conduct could have prejudiced Treadway.

### 3. Sufficiency of the Evidence

[7] Finally, Treadway contends that the trial court erred by denying his motion to dismiss for insufficiency of the evidence. In essence, Treadway contends that the record simply does not contain sufficient evidence to support a finding that he actually possessed the prescription medications at issue here. We disagree.

In order to survive a motion to dismiss predicated upon the alleged insufficiency of the evidence to support a finding of guilt, the State must elicit "substantial evidence of each essential element of the crime [charged] and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998), *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548, 122 S. Ct. 628 (2001). Substantial evidence is sufficient evidence "necessary to persuade a rational juror to accept a conclusion." *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776, 781 (citing *State v. Frogge*, 351 N.C. 576, 584, 528 S.E.2d 893, 899, *cert. denied*, 531 U.S. 994, 148 L. Ed. 2d 459, 121 S. Ct. 487 (2000)), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403, 123 S. Ct. 495 (2002). In determining whether the record contains substantial evidence of guilt, the trial court must consider the evidence in the light most favorable to the State and draw all reasonable inferences that may be made from the evidence in the State's favor. *Id.* (citing *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001), *overruled on other grounds in State v. Allen*, 359 N.C. 425, 437, 615 S.E.2d 256 (2005), *disapproved of on other grounds in State v. Lasiter*, 361 N.C. 299, 306, 643 S.E.2d 909, 913 (2007)). We review the trial court's ruling with respect to such a dismissal motion on a *de novo* basis. *State v. Stephens*, 244 N.C. 380, 384, 93 S.E.2d 431, 433 (1956).

According to Treadway, the evidence presented by the State, although "highly suspicious," did not suffice to permit a reasonable juror to conclude that he "ever actually possessed or transported or sold any drugs."[7] However, during the course of his trial testimony, Mr. Shaw clearly stated that he gave prescription medications to Treadway on 5 August 2008:

> Q. [O]n August 5th, what did you do with your—with the Lorcet and the Xanax on that date?

---

7. Treadway was neither charged with nor convicted of a crime involving the transportation of illicit drugs. As a result, we will treat his challenge to the sufficiency of the evidence to support his trafficking convictions as resting on allegations that the evidence did not suffice to show that he ever possessed and delivered the medications in question.

A. I took them to Mr. Treadway's.

Q. Okay. And what did you do with them?

A. Gave them to [him].

Q. Okay. And how much did you give him?          ·

A. I think it was—it was either 80 or 90 Lorcets, and I think maybe 90 Xanax.

Mr. Shaw claimed to have been selling Lorcet and Xanax to Treadway since the beginning of 2008. More specifically, Mr. Shaw testified that he would give his medications to Treadway at his residence; that he would leave; that he would return thirty minutes to an hour later for the purpose of collecting payment; and that he had seen Ellison approaching Treadway's residence on several occasions while waiting to return and collect his payment. On 5 August 2008, Mr. Shaw claimed to have transferred the medications to Treadway in their original pharmacy bottles; however, he removed the labels from these bottles prior to the exchange. Before he departed from Treadway's residence, Treadway told Mr. Shaw he would call "Roy," which Mr. Shaw understood to be a reference to Ellison. This evidence, combined with the discovery of prescription drugs matching those that Mr. Shaw gave to Treadway in Ellison's vehicle, provides ample support for a jury finding that Treadway possessed the Lorcet tablets and delivered them to Ellison. As a result, Treadway's challenge to the sufficiency of the evidence to support his trafficking convictions lacks merit.

### C. Joint Arguments

### 1. Sufficiency of the Evidence

[8] In their briefs, Defendants argue that the trial court erred by denying their motions to dismiss the trafficking in opium and conspiracy to traffic in opium charges on the grounds that the medications at issue, which are Schedule III controlled substances, are not punishable under N.C. Gen. Stat. § 90-95(h)(4). We disagree.[8]

A proper resolution of this issue requires us to construe the relevant statutory provisions. "The principal goal of statutory construc-

---

8. The State contends that Ellison waived his right to challenge the sufficiency of the evidence to support his conviction because he failed to renew his dismissal motion after presenting evidence in his own defense. We need not determine the validity of the State's argument given the necessity for us to address this claim in connection with Treadway's appeal and given that we have found that it lacks substantive merit in that context.

tion is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998), *cert. denied*, 526 U.S. 1098, 143 L. Ed. 2d 671, 119 S. Ct. 1576 (1999)). "The best indicia of that intent are the language of the statute . . . , the spirit of the act and what the act seeks to accomplish." *Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). "Individual expressions must be construed as part of the composite whole and be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." *State v. Tew*, 326 N.C. 732, 739, 392 S.E.2d 603, 607 (1990) (citing *In re Hardy*, 294 N.C. 90, 240 S.E.2d 367 (1978)). We will attempt to construe the relevant statutory provisions utilizing these well-established rules of construction.

N.C. Gen. Stat. § 90-95(h)(4) provides that:

> Any person who sells, manufactures, delivers, transports, or possesses four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate (except apomorphine, nalbuphine, analoxone and naltrexone and their respective salts), including heroin, or any mixture containing such substance, shall be guilty of a felony which felony shall be known as "trafficking in opium or heroin" and if the quantity of such controlled substance or mixture involved:
>
> . . . .
>
> c. Is 28 grams or more, such person shall be punished as a Class C felon and shall be sentenced to a minimum term of 225 months and a maximum term of 279 months in the State's prison and shall be fined not less than five hundred thousand dollars ($ 500,000).[9]

At trial, the State presented substantial evidence tending to show Defendants' guilt of trafficking-related offenses. Special Agent Motsinger testified that a portion of the pills seized from Ellison's vehicle contained a mixture of hydrocodone and acetaminophen; that hydrocodone is a derivative of opium; that a mixture consisting of hydrocodone combined with acetaminophen is called dihy-

---

9. According to N.C. Gen. Stat. § 90-95(i), "[t]he penalties provided in subsection (h) of this section shall also apply to any person who is convicted of conspiracy to commit any of the offenses described in subsection (h) of this section."

drocodeinone; and that dihydrocodeinone is a derivative of opium.[10] Thus, the State clearly presented substantial evidence tending to show that the pills seized from Ellison consisted of a mixture that contained an opiate derivative. As a result of the fact that such an opiate derivative is *exactly the sort of substance to which* N.C. Gen. Stat. § 90-95(h)(4), when read literally, applies, we conclude that the record contained more than enough evidence to support a determination that Defendants' conduct was subject to the trafficking statutes.

Even so, Defendants argue that N.C. Gen. Stat. § 90-95(h)(4) does not apply in cases such as this one. At bottom, Defendants' argument rests on the claim that "the legislature never intended for [N.C. Gen. Stat.] § 90-95(h)(4) to address prescription medication, as [N.C. Gen. Stat. §] 90-95(d)(2) already addresses those violations." We do not find Defendants' logic persuasive.

N.C. Gen. Stat. § 90-95(d)(2) provides that:

> (d) Except as provided in subsections (h) and (i) of this section, any person who violates G.S. 90-95(a)(3) with respect to:
>
>      . . . .
>
> (2) A controlled substance classified in Schedule II, III, or IV shall be guilty of a Class 1 misdemeanor. If the controlled substance exceeds four tablets, capsules, or other dosage units or equivalent quantity of hydromorphone or if the quantity of the controlled substance, or combination of the controlled substances, exceeds one hundred tablets, capsules or other dosage units, or equivalent quantity, the violation shall be punishable as a Class I felony. If the controlled substance is methamphetamine, amphetamine, phencyclidine, or cocaine and any salt, isomer, salts of isomers, compound, derivative, or preparation thereof, or coca leaves and any salt, isomer, salts of isomers, compound, derivative, or preparation of coca leaves, or any salt, isomer, salts of isomers, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances (except decocanized

---

10. N.C. Gen. Stat. § 90-90(1)(a) explicitly treats hydrocodone as an "[o]pium or opiate, [or] a[] salt, compound, derivative, or preparation of opium and opiate."

> coca leaves or any extraction of coca leaves which
> does not contain cocaine or ecgonine), the violation
> shall be punishable as a Class I felony.

In seeking to persuade us of the merit of their position, Defendants emphasize that N.C. Gen. Stat. § 90-95(d)(2) contains language typically associated with the measurement of prescription drugs, as opposed to street drugs. According to Defendants, the presence of this language proves that the General Assembly intended that N.C. Gen. Stat. § 90-95(d)(2) govern criminal liability associated with prescription medications in lieu of N.C. Gen. Stat. § 90-95(h)(4). Defendants' logic is, however, unsound.

A fundamental problem with Defendants' argument is that N.C. Gen. Stat. § 90-95(d) clearly limits its application to situations not governed by N.C. Gen. Stat. § 90-95(h). That fact alone tends to establish that, to the extent that the provisions of N.C. Gen. Stat. § 90-95(d)(2) conflict with N.C. Gen. Stat. § 90-95(h)(4), the provisions of N.C. Gen. Stat. § 90-95(h)(4) control.

Moreover, the relevant statutory provisions do not, contrary to the implication of Defendants' argument, apply to identical factual situations. Simply put, the trafficking statutes apply to activities that N.C. Gen. Stat. § 90-95(d)(2) simply does not address. Although N.C. Gen. Stat. § 90-95(h)(4) penalizes the sale, manufacture, delivery, transportation, and possession of certain quantities of mixtures containing opiate derivatives, N.C. Gen. Stat. § 90-95(d)(2) only applies to violations of N.C. Gen. Stat. § 90-95(a)(3), the statutory provision that makes it illegal to "possess a controlled substance." Acceptance of Defendants' argument would mean, contrary to the plain language of N.C. Gen. Stat. § 90-95(h)(4), that the sale, manufacture, delivery, or transportation of prescription medications containing opiate derivatives would not be subject to any sort of separate punishment of the type contemplated by both the trafficking statutes and N.C. Gen. Stat. § 90-95(a)(1) (making "it . . . unlawful for any person[ t]o manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance").[11] As a result, given the complete absence of any language in N.C. Gen. Stat. § 90-95(d)(2) addressing

---

11. Interestingly, as is the case with N.C. Gen. Stat. § 90-95(d), which prescribes the punishments applicable to violations of N.C. Gen. Stat. § 90-95(a)(3), N.C. Gen. Stat. § 90-95(b), which sets out the penalties applicable to violations of N.C. Gen. Stat. § 90-95(a)(1), explicitly provides that it is subject to the provisions of N.C. Gen. Stat. § 90-95(h). This fact further undercuts Defendants' contention that the trafficking statutes do not apply to offenses involving prescription medications that contain opiate derivatives.

the sale, manufacture, delivery, or transportation of prescription medication separate and apart from the act of possessing such substances, the effect of accepting Defendants' contention would be to hold that the only criminal penalties applicable to violations of law relating to such medications are those applicable to possession, a result that is plainly inconsistent with the remainder of N.C. Gen. Stat. § 90-95.

Finally, N.C. Gen. Stat. § 90-95(d)(2) and N.C. Gen. Stat. § 90-95(h)(4) are fundamentally different statutory punishment schemes. The penalty provisions applicable to non-trafficking offenses set out in N.C. Gen. Stat. § 90-95(b) and N.C. Gen. Stat. § 90-95(d) are organized around the controlled substance schedules enumerated in N.C. Gen. Stat. § 90-89 through N.C. Gen. Stat. § 90-94. Any sentence imposed upon an offender convicted of violating N.C. Gen. Stat. § 90-95(a)(1) and N.C. Gen. Stat. § 90-95(a)(3) must be based on the schedule in which the controlled substance at issue in that particular case is listed. Although hydrocodone is contained in Schedule II, N.C. Gen. Stat. § 90-90(1)(a), that substance, when combined with acetaminophen, becomes dihydrocodeinone, which is statutorily classified as a Schedule III substance.[12] N.C. Gen. Stat. § 90-91(d); *see generally State v. Eaton,* —— N.C. App. ——, 707 S.E.2d 642 (2011) (stating that "the substance found in defendant['s] possession was a Schedule III substance, dihydrocodeinone, which is a form of hydrocodone"). For that reason, punishment for the manufacture, sale, delivery, possession with the intent to sell or deliver, or possession of dihydrocodeinone outside the trafficking context is governed by the statutory provisions applicable to Schedule III controlled substances. The penalty structure set out in N.C. Gen. Stat. § 90-95(h), on the other hand, applies to only a subset of the overall category of controlled substances, makes no reference to the schedules in which those substances are contained, and rests upon the weight of the substance at issue in the particular case under consideration rather than the applicable controlled substance schedule. Simply put, the controlled substance schedule to which a particular opiate derivative is assigned has nothing to do with the extent to which activities involving that substance are subject to punishment under the trafficking statutes. While Defendants view the disconnect between these two penalty structures as evidence of a legislative intent that the trafficking

---

12. The fact that hydrocodone is defined as a Schedule II controlled substance while dihydrocodeinone is not has no effect on the proper resolution of this issue given that the literal language of N.C. Gen. Stat. § 90-95(h)(4) clearly encompasses substances such as dihydrocodeinone.

STATE v. ELLISON

[213 N.C. App. 300 (2011)]

statues be deemed inapplicable to prescription medications containing opiate derivatives,[13] we have no trouble, given the clear precedence given to the trafficking statutes in N.C. Gen. Stat. § 90-95(b) and N.C. Gen. Stat. § 90-95(d), in concluding that the General Assembly drafted N.C. Gen. Stat. § 90-95(h) for the purpose of punishing acts of trafficking in specific controlled substances at the level specified in N.C. Gen. Stat. § 90-95(h) regardless of the extent to which those same activities would also be subject to punishment under other provisions of N.C. Gen. Stat. § 90-95 and that the result reached here, rather than contradicting the General Assembly's intent, is actually reflective of it. Although Defendants strenuously argue that acceptance of the approach embodied in our decision will result in the imposition of grossly disproportionate and unfair punishments for individuals involved in opium-based prescription drug activities compared to the punishments imposed upon individuals involved in other drug-related activities, that argument is more appropriately directed to the General Assembly, which is ultimately responsible for deciding the punishments applicable to all criminal offenses, than to this Court. As a result, the trial court did not err by refusing to dismiss the trafficking charges against Defendants on the grounds that the trafficking statutes did not apply to cases involving Schedule III controlled substances like those at issue here.[14]

## 2. Special Agent Motsinger's Rebuttal Testimony

[9] Finally, Defendants argue that the trial court erred by allowing Special Agent Motsinger to testify on rebuttal that dihydrocodeinone and hydrocodone contained opium. We disagree.

13. In advancing this argument, Defendants contend that treating prescription medications like hydrocodeinone as subject to the trafficking statutes could, depending on the nature of the mixture, render the penalty provisions of N.C. Gen. Stat. § 90-95(d)(2) meaningless. Although our decision may have the effect of subjecting certain defendants otherwise punishable pursuant to N.C. Gen. Stat. § 90-95(d)(2) to punishment under N.C. Gen. Stat. § 90-95(h)(4), the availability of both options stems from the fact that the relevant statutory language clearly creates the situation about which Defendants complain. As a result, since the best evidence of the General Assembly's intent is the language that it used and since the language of the relevant statutory provisions clearly demonstrates that some offenses that might otherwise be punishable pursuant to N.C. Gen. Stat. § 90-95(d)(2) are, instead, punishable pursuant to N.C. Gen. Stat. § 90-95(h)(4), we are not persuaded by Defendants' argument that our decision in this case will render N.C. Gen. Stat. § 90-95(d)(2) meaningless.

14. Although Defendants rely on the rule of lenity in support of their argument that the prescription medications at issue here are not subject to the trafficking statutes, that principle only applies to the construction of ambiguous statutes. *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007). We do not, for the reasons discussed in the text, find any ambiguity in the relevant statutory provisions.

After the presentation of Ellison's evidence, the State requested permission to recall Agent Motsinger in order to "clear up any issues that there [were] with regard to the dihydrocodeine, and also testify very specifically that—that it, in addition to hydrocodone are opiate derivatives." In response, Defendants urged the trial court to deny the State's request:

I would contend that there is no evidence been presented by Mr. Ellison to allow the State to offer rebuttal evidence. There is nothing Mr. Ellison testified to which would—could be rebutted by the SBI analyst. I understand it's in Your Honor's discretion, but I think, you know, to be rebuttal, there needs to be some evidence to rebut, and we would contend that any testimony that she—that he would offer to produce at this time would not be in the nature of rebuttal evidence, and I ask you to deny the request.

After hearing the arguments of counsel, the trial court permitted the State to recall Special Agent Motsinger, specifically noting that her rebuttal testimony would concern "a matter that wasn't brought out on the State's case in chief" and that it would "entertain a motion by the defendants to present additional evidence[.]"

N.C. Gen. Stat. § 15A-1226 provides that:

(a) Each party has the right to introduce rebuttal evidence concerning matters elicited in the evidence in chief of another party. The judge may permit a party to offer new evidence during rebuttal which could have been offered in the party's case in chief or during a previous rebuttal, but if new evidence is allowed, the other party must be permitted further rebuttal.

(b) The judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict.

Defendants contend that the trial court erred by allowing the presentation of Special Agent Motsinger's rebuttal testimony because this testimony was offered for the sole purpose of curing the State's failure to present evidence concerning an element of the offenses with which Defendants had been charged during its case in chief. We do not find Defendants' argument persuasive.

In *State v. Quick*, 323 N.C. 675, 375 S.E.2d 156 (1989), the Supreme Court held that N.C. Gen. Stat. § 15A-1226 provides "clear authorization for a trial judge, within his discretion, to permit a party

to introduce additional evidence at any time prior to the verdict" and allows the "judge [to] permit a party to offer new evidence which could have been offered in the party's case in chief or during a previous rebuttal as long as the opposing party is permitted further rebuttal." *Quick*, 323 N.C. at 681-82, 375 S.E.2d at 159 (citing *State v. Riggins*, 321 N.C. 107, 109, 361 S.E.2d 558, 559 (1987), and *State v. Lowery*, 318 N.C. 54, 70, 347 S.E.2d 729, 740 (1986)). The rationale underlying the Supreme Court's holding in *Quick* is most clearly stated in *Lowery*:

> The order of presentation of evidence at trial and the limitations on the right to present new evidence on rebuttal are designed primarily to ensure the orderly presentation of evidence. It is the trial judge's duty to supervise and control the trial, including the manner and presentation of evidence, matters which are largely left to his discretion.

*Lowery*, 318 N.C. at 70, 347 S.E.2d at 740 (citing *State v. Harris*, 308 N.C. 159, 168, 301 S.E.2d 91, 97 (1983)). In light of *Quick* and *Lowery*, we are unable to find that the trial court abused its discretion by permitting the presentation of otherwise admissible evidence on rebuttal, particularly given the fact that the State lacked any basis for believing that Defendants disputed whether incidents involving dihydrocodeinone and hydrocodone were subject to punishment under the drug trafficking statutes before they made their dismissal motions at the close of the State's evidence, the absence of any serious challenge to the accuracy of the information contained in Special Agent Motsinger's rebuttal testimony, and the fact that the trial court provided Defendants with ample opportunity to rebut or otherwise respond to Special Agent Motsinger's rebuttal testimony. As a result, the trial court did not err by admitting Special Agent Motsinger's rebuttal testimony.

### D. Clerical Error

[10] In reviewing the record, we have noted a discrepancy between the indictments and verdicts returned against Treadway and the judgment entered based upon those indictments and verdicts. Although the judgment reflected that Treadway had been convicted of "trafficking by transporting 28 [grams]," the grand jury charged Treadway with trafficking by delivery and the jury found him guilty of the same offense. However, since N.C. Gen. Stat. § 90-95(h)(4) punishes trafficking by transportation and trafficking by delivery in an identical manner, this error had no impact upon the sentence imposed upon Treadway and constituted a mere clerical error. "When, on appeal, a

clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record 'speak the truth.' " *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696 (2008) (quoting *State v. Linemann*, 135 N.C. App. 734, 738, 522 S.E.2d 781, 784 (1999)); *see also State v. Taylor*, 156 N.C. App. 172, 177, 576 S.E.2d 114, 117-18 (2003) (defining clerical error as " 'an error resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination' ") (quoting *State v. Jarman*, 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000)). Thus, we conclude that this case should be remanded to the trial court for the limited purpose of correcting the clerical error contained in the trial court's judgment, so that the judgment will reflect the offense Treadway was convicted of committing.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that Defendants received a fair trial that was free from prejudicial error and that all of Defendants' challenges to the trial court's judgments lack merit. As a result, we further conclude that Defendants are not entitled to any relief on appeal and that the trial court's judgments should remain undisturbed, with the limited exception that the judgment imposed upon Treadway should be remanded to the trial court for the correction of a clerical error.

NO ERROR; REMAND TO CORRECT CLERICAL ERROR.

Judges BRYANT and STEELMAN concur.