IN THE SUPREME COURT OF NORTH CAROLINA

No. 363PA11

FILED 8 MARCH 2013

STATE OF NORTH CAROLINA

v.

LEE ROY ELLISON


STATE OF NORTH CAROLINA

v.

JAMES EDWARD TREADWAY


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 713 S.E.2d 228 (2011), finding no prejudicial error in judgments entered on 9 October 2009 by Judge Anderson D. Cromer in Superior Court, Ashe County, but remanding for correction of a clerical error in one judgment. Heard in the Supreme Court on 4 September 2012.

*Roy Cooper, Attorney General, by Brandon L. Truman and Robert D. Croom, Assistant Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Andrew DeSimone, Assistant Appellate Defender, for defendant-appellant Lee Roy Ellison.*

*Daniel F. Read for defendant-appellant James Edward Treadway.*

*Anne Bleyman, and Rudolph Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for North Carolina Advocates for Justice, amicus curiae.*

NEWBY, Justice.

This case presents the question whether N.C.G.S. § 90-95(h)(4) of the North Carolina Controlled Substances Act, N.C.G.S. §§ 90-86 to -113.8 (2011), applies in cases involving prescription pharmaceutical tablets and pills. Subdivision 90-95(h)(4), the opium trafficking statute, explicitly provides that a defendant's criminal liability shall be based on the total weight of the mixture involved. Because tablets and pills are mixtures, we conclude that defendants were properly sentenced under the opium trafficking statute. Accordingly, the decision of the Court of Appeals is affirmed.

The Ashe County Sheriff's Office received a tip from a confidential informant regarding an ongoing arrangement between defendants, Lee Roy Ellison and James Edward Treadway, to trade in prescription drugs. After a brief period of surveillance, officers stopped Ellison leaving Treadway's home with pill bottles from which the labels had been removed. The bottles appeared to contain prescription pharmaceuticals.

Later analysis revealed that the bottles held 90 pills of dihydrocodeinone, an opium derivative, and 80 pills of alprazolam. The dihydrocodeinone pills weighed a total of 75.3 grams. Using the aggregate weight of the dihydrocodeinone pills, the State charged defendants with a number of violations of the Controlled Substances Act, including trafficking in 28 grams or more of a mixture containing opium.

Defendants moved to dismiss the trafficking charges. They argued that the General Assembly did not intend that charges stemming from possession of

prescription medications be based on total weight. The trial court denied defendants' motions, and the jury found defendants guilty of trafficking in 28 grams or more of a mixture containing opium. In accordance with the opium trafficking statute, the court sentenced each defendant to 225 to 279 months of imprisonment plus a $500,000 fine. Defendants appealed, arguing, *inter alia*, that the trial court erred by denying their motions to dismiss the trafficking charges. *State v. Ellison*, ___ N.C. App. ___, ___, 713 S.E.2d 228, 241 (2011).

Relying on its own decisions in *State v. McCracken*, 157 N.C. App. 524, 579 S.E.2d 492 (2003) and *State v. Jones*, 85 N.C. App. 56, 354 S.E.2d 251, *disc. rev. denied*, 320 N.C. 173, 358 S.E.2d 61, *cert. denied*, 484 U.S. 969, 108 S. Ct. 465, 98 L. Ed. 2d 404 (1987), the Court of Appeals unanimously affirmed the trial court's decision. *Ellison*, ___ N.C. App. ___, ___, 713 S.E.2d 228, 236, 246. That court held that under the Controlled Substances Act, "liability for trafficking cases involving prescription medications hinges upon the total weight of the pills or tablets in question instead of the weight of the controlled substance contained within those medications." *Id.* at ___, 713 S.E.2d at 236 (citing *McCracken*, 157 N.C. App. 524, 579 S.E.2d 492). The court explained that "the ultimate responsibility for determining the manner in which criminal offenses should be punished lies with the General Assembly," and further concluded that a rational basis exists "for subjecting individuals involved in large scale distribution of mixtures containing controlled substances to more severe punishment." *Id.* at ___, 713 S.E.2d at 237

(citing, *inter alia*, *State v. Perry*, 316 N.C. 87, 101-02, 340 S.E.2d 450, 459 (1986)). We allowed defendants' petitions for discretionary review, *State v. Ellison*, ___ N.C. ___, 722 S.E.2d 593 (2012); *id.* at ___, 722 S.E.2d at 594 (2012), to determine whether the total weight of pills and tablets should be used to calculate liability under the trafficking provisions of the Controlled Substances Act.

In 1980 the General Assembly amended the Controlled Substances Act by adding a provision to further deter the distribution and use of opium derivatives. Act of June 25, 1980, ch. 1251, sec. 6, 7, 1979 N.C. Sess. Laws (2d Sess. 1980) 173, 174-78. Now codified at N.C.G.S. § 90-95(h)(4), the opium trafficking statute reads:

> Any person who sells, manufactures, delivers, transports, or possesses four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate (except apomorphine, nalbuphine, analoxone and naltrexone and their respective salts), including heroin, or any mixture containing such substance, shall be guilty of a felony which felony shall be known as "trafficking in opium or heroin" and if the quantity of such controlled substance or mixture involved:
>
> a. Is four grams or more, but less than 14 grams, such person shall be punished as a Class F felon and shall be sentenced to a minimum term of 70 months and a maximum term of 84 months in the State's prison and shall be fined not less than fifty thousand dollars ($50,000);
>
> b. Is 14 grams or more, but less than 28 grams, such person shall be punished as a Class E felon and shall be sentenced to a minimum term of 90 months and a maximum term of 117 months in the State's prison and shall be fined not less than one hundred thousand dollars ($100,000);

c. Is 28 grams or more, such person shall be punished as a Class C felon and shall be sentenced to a minimum term of 225 months and a maximum term of 279 months in the State's prison and shall be fined not less than five hundred thousand dollars ($500,000).

Under this statute a person will be punished at the maximum level "if the quantity of such controlled substance or mixture involved . . . [i]s 28 grams or more."

While "mixture" is not defined by the Controlled Substances Act, other courts have defined the term. In a case involving criminal prosecution under federal controlled substances laws, the Supreme Court of the United States said that "[a] 'mixture' is defined to include 'a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence.'" *Chapman v. United States*, 500 U.S. 453, 462, 111 S. Ct. 1919, 1926, 114 L. Ed. 2d 524, 536 (1991) (quoting *Webster's Third New International Dictionary* 1449 (1986)). Applying a similar definition in *McCracken*, our Court of Appeals reasoned that tablets, pills, and capsules are mixtures because they "contain commingled substances that are identifiable and thus regarded as retaining their separate existence." 157 N.C. App. at 527, 579 S.E.2d at 495 (applying the opium trafficking statute in a case involving tablets containing opium derivatives (citing, *inter alia*, *Jones*, 85 N.C. App. at 68, 354 S.E.2d at 258)). Likewise, in *Jones*, a case involving tablets containing opium derivatives where charges were brought under the opium

trafficking statute, the Court of Appeals held that "[c]learly, the legislature's use of the word 'mixture' establishes that the total weight of the dosage units . . . is sufficient basis to charge a suspect with trafficking." 85 N.C. App. at 68, 354 S.E.2d at 258. Consequently, the pills at the heart of this case are, by definition, a "mixture" as contemplated by the opium trafficking statute.

Defendants nevertheless argue that the General Assembly intended for the opium trafficking statute to apply only to large-scale drug distribution operations, not cases involving "amounts typical of individual users." According to defendants, if the pills' total weight is determinative, then the weekly dosage recommended by physicians would trigger the highest level of punishment under the statute. Defendants thus contend that the sentences required by the plain language of the opium trafficking statute are absurd and unjust and not in accord with the statute's purpose. Defendants instead point to a different provision of the Controlled Substances Act, N.C.G.S. § 90-95(d)(2), and assert that the rule of lenity requires courts to apply that statute in cases involving pills and tablets. Rather than total weight, subdivision 90-95(d)(2) calculates criminal liability based on the number of "tablets, capsules, or other dosage units" involved and apparently would have carried a lesser sentence in this case.

"It is well settled that the General Assembly and not the judiciary determines the minimum and maximum punishment which may be imposed on those convicted of crimes." *Perry*, 316 N.C. at 101, 340 S.E.2d at 459. When reviewing criminal

sentencing, we seek to apply the law consistently with the intent of the General Assembly. And, the legislature's "actual words," codified in our General Statutes, "are the clearest manifestation of its intent." *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) (citation omitted). Judicial construction, like the rule of lenity, only applies when a statute is ambiguous. *Lee v. Gore*, 365 N.C. 227, 230, 717 S.E.2d 356, 358 (2011) (stating that "there is no room for judicial construction" when the "language of a statute is clear and unambiguous"); *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007) (applying the rule of lenity to an ambiguous criminal statute).

Because the opium trafficking statute is clear and unambiguous, we are required to apply the statute's plain language that prohibits trafficking in mixtures containing opium derivatives, such as the pills in this case. Even if we did consider other evidence of legislative intent, it appears the result would be the same. The statute defendants would have us apply instead, N.C.G.S. § 90-95(d)(2), explicitly states that it is subject to subsection (h), which includes the opium trafficking provisions in section 90-95. So the General Assembly plainly intended for the opium trafficking statute, not subdivision 90-95(d)(2), to control in cases involving "four grams or more" of a mixture containing opium derivatives. Moreover, in 2009, well after our Court of Appeals addressed this issue in *McCracken* and *Jones*, the General Assembly considered legislation that would have amended the opium trafficking statute so that criminal liability would be based on the number of

-7-

prescription pills involved rather than total weight. H. 1307, 149th Gen. Assemb., Reg. Sess. (N.C. 2009) ("An Act To Clarify That Possession of Certain Prescription Drugs Is Not Punishable As Trafficking in Opium or Heroin and To Set Out the Criminal Penalty for That Offense"). The General Assembly, however, declined to make that change. Act of July 1, 2010, ch. 49, 2009 N.C. Sess. Laws (Reg. Sess. 2010) 255 (amending the state constitution on an unrelated matter). While not dispositive, the General Assembly's consideration of the issue and decision not to amend the statute are at least some evidence of tacit approval for applying the statute to tablets and pills. *See, e.g., State v. Jones*, 358 N.C. 473, 483-84, 598 S.E.2d 125, 131-32 (2004) (applying the concept of legislative acquiescence to the judicial interpretation of a criminal statute (citing *State v. Gardner*, 315 N.C. 444, 462, 340 S.E.2d 701, 713 (1986); *State v. Council*, 129 N.C. 511, 513, 39 S.E. 814, 815 (1901))); *Young v. Woodall*, 343 N.C. 459, 462-63, 471 S.E.2d 357, 359 (1996) ("The failure of a legislature to amend a statute which has been interpreted by a court is some evidence that the legislature approves of the court's interpretation.").

Thus, we hold that the opium trafficking statute applies in cases involving tablets and pills of prescription pharmaceutical drugs. Because defendants possessed more than 28 grams of a mixture containing an opium derivative, the trial court correctly sentenced defendants under the opium trafficking statute. Though we are not unmindful of the harsh results imposed by the statute, to conclude otherwise would encroach upon the role of the legislative branch. N.C.

Const. art. I, § 6. Had the General Assembly intended for prescription tablets and pills to fall outside the scope of the statute, it could have easily included plain language to that effect. Defendants' argument therefore would be better addressed to the legislature, Evan M. Musselwhite, Comment, *One Tough Pill To Swallow: A Call To Revise North Carolina's Drug Trafficking Laws Concerning Prescription Painkillers*, 33 Campbell L. Rev. 451 (2011), or in a petition to the Governor for clemency, N.C. Const. art. III, § 5, cl. 6. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice BEASLEY did not participate in the consideration or decision of this case.

Justice HUDSON, concurring in the result only.

I write separately because, while I concur that defendants' offenses are covered by the plain language of N.C.G.S. § 90-95(h)(4), I find the result troubling in that it may permit prosecution of some persons whose activities are beyond the intended reach of the original legislation.

The legislative intent behind subsection 90-95(h) shows that the law was meant to punish large-scale distributors of illegal drugs. The public papers of

Governor Hunt, who requested that the General Assembly enact the measure, show

such intent:

> *We must strengthen our commitment to fighting the*
> *big-time drug dealer* who has been driven to North
> Carolina by strong laws which have been enacted in
> states like Florida.
> We need the same sort of tough laws in North
> Carolina. For that reason, we will present to the General
> Assembly next month emergency legislation which will
> impose extremely harsh mandatory prison terms and
> large fines for *those persons convicted of dealing in large*
> *quantities of four kinds of drugs which have become a*
> *serious problem. These are marijuana, methaqualone,*
> *cocaine, and opium derivatives.*
> This legislation will not change the penalties for
> those convicted of the possession, manufacture, or sale of
> those drugs in small quantities as provided in the current
> law. But for those who *are obviously dealing for profit,*
> the penalties will be very tough.

James Baxter Hunt, Jr., Governor of N.C., Statement on Increased Penalties for

Drug Dealers (May 21, 1990), *in* 1 *Addresses and Public Papers of James Baxter*

*Hunt, Jr.* (Memory F. Mitchell ed., 1982) at 735 (emphases added) (footnote

omitted). Whether prescription pills were intended to be covered by the statute is

immaterial: the point of subsection 90-95(h) was, and still is, to punish large-scale

drug traffickers. Punishments for end users are codified in § 90-95(d).

But here defendants Ellison and Treadway were charged with trafficking

when they were arrested for buying and selling, respectively, a single end-user

amount of ninety Lorcet pills. Under this interpretation of the statute, a defendant

would need to possess a mere five Lorcet pills (less than the daily maximum dosage)

to be charged with trafficking. While the State maintained at oral argument that such an occurrence is unlikely, it has already happened. In *State v. Burrow*, ___ N.C. App. ___, 721 S.E.2d 356, *vacated and remanded on other grounds*, ___ N.C. ___, 736 S.E.2d 484 (2012) (per curiam order), argued a month after these cases, the defendant was convicted of trafficking by possessing only twenty-four oxycodone pills. In addition, this Court has considered numerous Petitions for Discretionary Review involving similar fact patterns. *See, e.g., State v. McAllister,* ___ N.C. App. ___, 731 S.E.2d 276, 2012 WL 3571069 (2012) (unpublished) (upholding a trafficking conviction based on nine oxycodone pills), *disc. rev. denied*, 736 S.E.2d 491 (2013); *State v. Seamster*, ___ N.C. App. ___, 716 S.E.2d 440, 2011 WL 4553120 (2011) (unpublished) (involving a conviction for twenty hydrocodone pills), *disc. rev. denied,* 722 S.E.2d 606 (2012). The Court of Appeals has also apparently seen these types of charges in cases that were not appealed to this Court. *See, e.g., State v. Davis*, ___ N.C. App. ___, ___, 733 S.E.2d 191, 192 (2012) (involving a conviction for trafficking by transportation and possession of 29 Percocet—a combination of oxycodone and non-controlled substances—pills); *State v. Romero*, ___ N.C. App. ___, 729 S.E.2d 731, 2012 WL 3192738, at *1-2 (2012) (unpublished) (involving a conviction for trafficking by possession of 30.5 oxycodone pills). And even more unsettling, as noted by defendants, possession of one bottle of over-the-counter cough syrup containing codeine could be punished as trafficking under this literal application of the statute. This cannot be what the legislature intended.

The majority is also correct that the plain language of the statute allows for the mass of an entire "mixture" to be considered and that this definition could apply to prescription pills or tablets as well. But, this interpretation also leads to disturbing results. Taking total mass into account makes sense in the street drug context: drug dealers often "cut" their product with other substances to increase the number of customers and to thus make a larger profit. This practice was recognized by this Court in *State v. Perry*: "The mixing and packaging into dosage containers of a controlled substance with other noncontrolled substances indicates an intent to distribute the controlled substance on a large scale." 316 N.C. 87, 101, 340 S.E.2d 450, 459 (1986). However, that logic does not apply when examining prescription pills. Instead of the drug dealer mixing the substance, it is the pharmaceutical company, with different incentives, that creates the tablet or pill. Therefore, I would suggest that the General Assembly reconsider whether it intends that "mixtures" of illegal street drugs be treated differently from prescription pills for the purposes of subsection 90-95(h), and if so, to consider acting accordingly.

Finally, although the majority cites to a failed attempt to change this language in 2009 as evidence that the legislature has reviewed and approved our courts' interpretation of the statute, I do not see the failed legislation as providing compelling evidence of that fact. While the majority cites to *Young v. Woodall*, 343 N.C. 459, 462-63, 471 S.E.2d 357, 359 (1996) for the proposition that we may look to

legislative inaction for support of this Court's decision, this Court has also

pronounced that

> [w]e must be leery, however, of inferring legislative
> approval of appellate court decisions from what is really
> legislative silence. "Legislative inaction has been called a
> 'weak reed upon which to lean' and a 'poor beacon to
> follow' in construing a statute." 2A N. Singer, Sutherland
> Statutory Construction 407 (1984). "[It is] impossible to
> assert with any degree of assurance that [legislative
> inaction] represents (1) approval of the status quo, as
> opposed to (2) inability to agree upon how to alter the
> status quo, (3) unawareness of the status quo, (4)
> indifference to the status quo, or even (5) political
> cowardice."

*DiDonato v. Wortman*, 320 N.C. 423, 425, 358 S.E.2d 489, 490 (1987) (last sentence

quoting *Johnson v. Transp. Agency, Santa Clara Cnty., Cal.*, 480 U.S. 616, 672, 107

S. Ct. 1442, 1472 (Scalia, J. & Rehnquist, C.J., dissenting)); *see also N.C. Dep't of

Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 202, 675 S.E.2d 641, 650 (2009) ("That a

legislature declined to enact a statute with specific language does not indicate the

legislature intended the exact opposite."); *Styers v. Phillips,* 277 N.C. 460, 472–73,

178 S.E.2d 583, 589–91 (1971) ("[O]rdinarily the intent of the legislature is

indicated by its actions, and not by its failure to act.").  Though our precedent on

this issue appears less than crystal clear, I find the reasoning in *DiDonato* more

compelling than the reasoning in *Young*, and more in line with United States

Supreme Court precedent.  *See, e.g., United States v. Craft*, 535 U.S. 274, 287, 122

S. Ct. 1414, 1425 (2002) (stating that "[c]ongressional inaction lacks persuasive

significance because several equally tenable inferences may be drawn from such inaction" (alteration in original) (citation and quotation marks omitted)); *Schweiker v. Chilicky*, 487 U.S. 412, 440, 108 S. Ct. 2460, 2476 (1988) ("Inaction, we have repeatedly stated, is a notoriously poor indication of congressional intent . . . ." (Brennan, Marshall & Blackmun, J.J., dissenting) (citations omitted)); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S. Ct. 2668, 2678 (1990) ("But subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change.' " (internal citations omitted)). Therefore, I would not accord much weight, if any, to the General Assembly's failure to ultimately amend N.C.G.S. § 90-95(h)(4).

The illegal sale and use of prescription drugs is one of the most serious problems currently confronting law enforcement. Accordingly, traffickers in this market should be punished severely; however, our current application of N.C.G.S. § 90-95(h)(4) has led, in this case—and in others—to the prosecution and conviction of individuals who do not appear to fall within the intended class targeted by the statute: large-scale professional drug dealers. Instead, small-scale dealers and end users have been swept in by the broad language of the statute. I am confident that

this is not what the General Assembly intended in enacting this statute. As such, I respectfully concur in the result only.


Justice JACKSON joins in this concurring opinion.