**STATE v. HEAVNER**

[227 N.C. App. 139 (2013)]

---

STATE OF NORTH CAROLINA
v.
BRENT SHAUN HEAVNER

No. COA12-1005

Filed 7 May 2013

1. **Prisons and Prisoners—malicious conduct by a prisoner— statute not ambiguous—two distinct acts**

   The trial court did not err in a malicious conduct by a prisoner case by failing to dismiss one of the two charges. The rule of lenity, which requires that ambiguity concerning the ambit of a criminal statute be resolved in favor of lenity, was not applicable as there is no ambiguity in the statute defining malicious conduct by prisoner. Furthermore, defendant was charged with two separate, distinct acts.

2. **Jury—extraneous information—admission erroneous—no contribution to conviction**

   The trial court did not err in a malicious conduct by a prisoner

case by denying defendant's motion for appropriate relief. Although it was error for the trial court to receive evidence about the subjective impact of extraneous information a juror received from a conversation the juror had with defendant's mother while waiting in the courthouse hallway prior to jury selection, there was no reasonable possibility that the violation might have contributed to the conviction.

Appeal by Defendant from judgments entered 13 July 2010 by Judge F. Lane Williamson in Lincoln County Superior Court and from order entered 1 March 2012 by Judge Forrest D. Bridges in Lincoln County Superior Court. Heard in the Court of Appeals 31 January 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Thomas H. Moore, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Anne M. Gomez, for Defendant.*

DILLON, Judge.

Brent Shaun Heavner (Defendant) appeals from judgments entered upon his convictions of three counts of assault on a governmental official and two counts of malicious conduct by prisoner. Defendant also appeals from the trial court's denial of his motion for appropriate relief. We find no error.

The evidence of record tends to show the following: In 2008, Defendant, who was in his early twenties, lived with his grandmother ("Ms. Heavner"), who was eighty-three years old, in Vale, North Carolina. Defendant had substance abuse problems. Ms. Heavner testified that when Defendant drinks alcohol, "he just loses it."

On 16 February 2008, Defendant started drinking alcohol late in the afternoon, which concerned Ms. Heavner. Later that evening, Defendant became violent towards Ms. Heavner and also threatened to harm himself. Ms. Heavner testified that at approximately 10:00 p.m., Defendant "went and got the butcher knife and told [her] that he was going to cut himself, which he . . . did quite often." Ms. Heavner retreated from the house and started across the street to the home of her sister and brother-in-law (the Lovings). Defendant followed her and encouraged her to come back into the house. Ms. Heavner testified that Defendant did not want her to "call the law."

The Lovings heard the disturbance and turned their porch light on, whereupon Defendant retreated to Ms. Heavner's house. However, Ms. Heavner proceeded to the Lovings' house, and Mr. Loving called the police.

Deputy Christopher Locklear (Deputy Locklear), Deputy J. Owens (Deputy Owens), and Sergeant C.D. Stamper (Sergeant Stamper) responded to Mr. Loving's call. The officers saw Defendant on the front porch of Ms. Heavner's house, but when the officers reached the driveway, Defendant retreated inside. The officers then saw Defendant through a kitchen window holding a butcher knife. The officers discovered that the front door to the house was unlocked, and the officers entered the house. Deputy Locklear approached Defendant, placed him under arrest, and attempted to handcuff Defendant. Deputy Locklear said, when he attempted to handcuff Defendant, the following transpired:

> I reached for his right hand, and as soon as I did that he kind of blew up, started resisting. . . . He bucked up and kind of pulled away . . . for me not to be able to handcuff him. . . . We took him to the floor . . . and told him to stay on the ground while we tried to handcuff him. . . . He was very belligerent, started threatening to kill all of us. . . . [W]e finally got his other hand cuffed, [but] he continued to try to get up. . . . I think I asked him to calm down and let us help . . . get him up and he told me I could go to hell. He proceeded to . . . try to call his dog to attack us.

> [We] [f]inally got him on his feet, where we held his arm. We walked him 3 to 4 [feet], [but then he] fell to the floor. I asked him to stand back up. And that's when he stated that if he was going anywhere we [had to] carry him, and he wished he could spit in our mouths. . . . [So] when I went to pick him up he spit towards my face [and] hit me in the forehead area. . . . Sergeant Stamper began to help Deputy Owens try to get [Defendant] up, as I was wiping the spit off my forehead.

> They got him up . . . and before they could get him out of the house . . . we placed him on the ground one more time because he was kicking. . . . After he got back up I think Sergeant Stamper and Deputy Owens had carried him and placed him on the ground outside in the driveway. . . . [W]e got him outside, stuck him on the ground, his clothes were pulled off where he had struggled so much, his pants. So we pulled his clothes back up so he would be more

appropriate. When I went to try to pull his clothes back on him he attempted to bite me on the leg, and then spit on me again. It hit me on the right arm. . . . And after he had spit on me for the second time, and this was probably a five minute difference, a five minute time frame difference in between the first spit and the second spit, after he had done that I think I – I don't think I even wiped it off that time. I think we just – myself and Sergeant Stamper picked him up and put him in the back seat of Deputy Owens' car. . . .

Defendant was indicted on two counts of malicious conduct by prisoner based on the two alleged instances of spitting on Deputy Locklear and on three counts of assault on a governmental official.[1] Defendant's case came on for trial at the 12 July 2010 session of Lincoln County Superior Court. On 13 July 2010, the jury found Defendant guilty of three counts of assault on a governmental official and two counts of malicious conduct by prisoner. The trial court, the Honorable F. Lane Williamson presiding, entered judgments on 13 July 2010 consistent with the jury's verdicts, sentencing Defendant to two consecutive terms of 28 to 34 months incarceration.

The day after the jury returned its verdict, Defendant's mother, Janet Elmore, contacted defense counsel and informed him that while waiting in the courthouse hallway prior to jury selection, she had spoken extensively to a person about Defendant's case and about Defendant's mental and substance abuse problems. She later realized that the person served on the jury in Defendant's case. Defendant filed a motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1414(b)(3), alleging that Defendant did not receive a fair trial based on this contact. At the hearing on Defendant's motion for appropriate relief, the juror to whom Ms. Elmore had spoken, Roger Diffendarfer, admitted that the conversation took place but that he did not take it into account in arriving at a verdict. The trial court, the Honorable Forrest D. Bridges presiding, denied Defendant's motion for appropriate relief after making oral findings and conclusions in open court. Judge Bridges also entered a written order denying Defendant's motion for appropriate relief.

Defendant appeals from the 13 July 2010 judgments. Defendant also appeals from the trial court's order denying his motion for appropriate relief.

---

1. Defendant was also indicted on two counts of communicating threats, which the State voluntarily dismissed during the trial.

## I: Motion to Dismiss

**[1]** In Defendant's first argument on appeal, he contends the trial court erred in denying his motion to dismiss one of the two malicious conduct by prisoner charges because "the Legislature did not intend multiple punishment[s] for more than one instance of emission of bodily fluids during the same continuous transaction." We disagree.

"This Court reviews the trial court's denial of a motion to dismiss *de novo.*" *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455, *cert. denied*, 531 U.S. 890 (2000) (quotation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980).

N.C. Gen. Stat. § 14-258.4 (2011), defines malicious conduct by prisoner, in pertinent part, as follows:

> Any person in the custody of . . . any law enforcement officer, . . . who knowingly and willfully throws, emits, or causes to be used as a projectile, bodily fluids or excrement at a person who is an employee of the State or a local government while the employee is in the performance of the employee's duties is guilty of a Class F felony. . . .

The crime of malicious conduct by a prisoner, as defined by the foregoing statute, has the following elements:

(1)  the defendant threw, emitted, or caused to be used as a projectile a bodily fluid or excrement at the victim;

(2)  the victim was a State or local government employee;

(3)  the victim was in the performance of his or her State or local government duties at the time the fluid or excrement was released;

(4)  the defendant acted knowingly and willfully; and

(5)  the defendant was in the custody of . . . any law enforcement officer. . . .

*State v. Noel*, 202 N.C. App. 715, 718, 690 S.E.2d 10, 13, *disc. review denied*, 364 N.C. 246, 699 S.E.2d 642 (2010).

Defendant's argument in this case is not based on an alleged failure by the State to present substantial evidence to support each of the foregoing elements of malicious conduct by prisoner. Rather, Defendant argues that because the evidence in this case shows that the two charges of malicious conduct by prisoner stem from "the same continuous transaction[,]" and because the "Legislature did not intend multiple punishments for more than one instance of emission of bodily fluids[,]" the trial court erred by failing to dismiss one of the charges of malicious conduct by prisoner.[2] We find this argument without merit.

The question posed by Defendant in this appeal is essentially whether the two incidents of spitting on Deputy Locklear by Defendant constitute two separate charges of malicious conduct by prisoner in violation of N.C. Gen. Stat. § 14-258.4. *See generally, State v. Smith*, 323 N.C. 439, 441, 373 S.E.2d 435, 437 (1988) (explaining *Bell v. United States*, 349 U.S. 81 (1955), which the Court describes as "a landmark case" regarding the principal of lenity in construing a criminal statute). Defendant argues the rule of lenity requires that N.C. Gen. Stat. § 14-258.4 be interpreted to support only one charge if, as in this case, a defendant completes multiple acts constituting malicious conduct by prisoner, but does so in one continuous transaction. The rule of lenity, however, "applies only when the applicable criminal statute is ambiguous[,]" *State v. Crawford*, 167 N.C. App. 777, 780, 606 S.E.2d 375, 378, *disc. review denied*, 359 N.C. 412, 612 S.E.2d 324 (2005) (citation omitted), and when applicable, the rule of lenity requires that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity[,]" *Rewis v. United States*, 401 U.S. 808, 812 (1971). Our Supreme Court has declined to apply the rule of lenity to interpret a criminal statute when the statute "only [has one] plausible reading that comports with the legislative purpose" of enacting the statute. *State v. Abshire*, 363 N.C. 322, 332, 677 S.E.2d 444, 451 (2009) (stating that "the word 'address' in terms of indicating defendant's residence is not a liberal reading in favor of the State"); *see also State v. Ellison*, __ N.C. App. __, __, 713 S.E.2d 228, 244 (2011), *aff'd*, __ N.C.

---

2. The State argues in its brief that the Defendant failed to preserve this argument on appeal because "Defendant made his motion to dismiss only after the close of the State's evidence and did not renew his motion after declining to put on evidence." However, Rule 10(a)(3) of the North Carolina Rules of Appellate Procedure states that a motion to dismiss at the close of the State's evidence is waived only if "the defendant then introduces evidence." In this case, Defendant did not put on evidence; and, therefore, Defendant's appeal on this issue is preserved.

__, 738 S.E.2d 161 (2013) (declining to apply the rule of lenity when the Court did not "find any ambiguity in the relevant statutory provisions").

When there is ambiguity in a criminal statute, however, the rule of lenity "forbids a court to interpret a statute so as to increase the penalty that it places on an individual when the Legislature has not clearly stated such an intention." *State v. Wiggins*, 210 N.C. App. 128, 133, 707 S.E.2d 664, 669, *cert. denied*, 365 N.C. 189, 707 S.E.2d 242 (2011) (quotation omitted). For example, in cases of possession of a firearm by a felon, this Court has held that a "defendant should be convicted and sentenced only once for possession of a firearm by a felon based on his simultaneous possession of [multiple] firearms[.]" *State v. Garris*, 191 N.C. App. 276, 285, 663 S.E.2d 340, 348, *disc. review denied*, 362 N.C. 684, 670 S.E.2d 907 (2008); *see also State v. Whitaker*, 201 N.C. App. 190, 207-08, 689 S.E.2d 395, 405-06 (2009), *aff'd*, 364 N.C. 404, 700 S.E.2d 215 (2010) (reversing ten of eleven convictions for possession of a firearm by a convicted felon where defendant possessed all eleven firearms simultaneously); *compare Smith*, 323 N.C. at 443, 373 S.E.2d at 438 (holding that a single transaction involving multiple obscene materials constitutes but one offense). This is because "the applicable . . . statute [in each case] shows no indication that the North Carolina Legislature intended for [the statute] to impose multiple penalties[.]" *Wiggins*, 210 N.C. App. at 134, 707 S.E.2d at 669 (quotation omitted).

In the case *sub judice*, Defendant relies on *State v. Dilldine*, 22 N.C. App. 229, 206 S.E.2d 364 (1974), to support his assertion that because the two spitting incidents arose out of the same transaction, i.e., Defendant's arrest, only one act of malicious conduct occurred. In *Dilldine*, the defendant fired five bullets in succession at the victim, though three of the bullets hit the victim in the front, and, after the victim turned away from the defendant, two bullets hit the victim in the back. *Id.* at 231, 206 S.E.2d at 366. The defendant was charged with two separate counts of felonious assault with intent to kill, one count for the three bullets that hit the victim in the front and another count for the two bullets that hit the victim in the back. *Id.* This Court held that "[i]t was improper to have two bills of indictment and two offenses growing out of this one episode." *Id.*

We believe, however, that this case is distinguishable from *Dilldine*. The facts of this case are more analogous to the facts in a case subsequent to *Dilldine* decided by our Supreme Court in *State v. Rambert*, 341 N.C. 173, 175, 459 S.E.2d 510, 512 (1995). In *Rambert*, the Supreme Court reversed this Court's ruling that the "defendant could be convicted of and sentenced for only one count of discharging a firearm into occupied

property" when the defendant "fired three shots from one gun into occupied property within a short period of time[.]" *Id.* at 174-75, 459 S.E.2d at 511. The *Rambert* court reasoned that "the evidence clearly shows that defendant was not charged three times with the same offense for the same act but was charged for three separate and distinct acts." *Id.* at 176, 459 S.E.2d at 512.

In *State v. Maddox*, 159 N.C. App. 127, 583 S.E.2d 601 (2003), this Court compared *Dilldine* and *Rambert* as follows:

> The scenario cautioned against in *Dilldine* is exactly the scenario presented in the case *sub judice.* There is no evidence that the five shots fired by defendant at [the victim] were separate assaults[.] . . . The State's attempt to analogize this case to *State v. Nobles*, 350 N.C. 483, 515 S.E.2d 885 (1999)[,] and *State v. Rambert*, 341 N.C. 173, 459 S.E.2d 510 (1995)[,] are unpersuasive. First of all, both cases are distinguishable in that neither involved charges of assault but instead multiple charges of discharging a weapon into occupied property. (citations omitted).
>
> . . . .
>
> [T]he North Carolina Supreme Court [in *Rambert*] concluded the evidence was sufficient to support the multiple charges of discharging a weapon into occupied property as it showed [the] defendant had been required to " 'employ his thought processes each time he fired the weapon' " and that each shot was an " 'act . . . distinct in time, and each bullet hit the vehicle in a different place.' "

*Id.* at 132-133, 583 S.E.2d at 605 (internal citations omitted). Employing the Court's reasoning in *Maddox*, we believe *Dilldine* is distinguishable from the case *sub judice*, and the principle of *Rambert* is applicable here. Similar to the facts in *Rambert*, Defendant was not charged with assault but rather with spitting at a police officer in violation of N.C. Gen. Stat. § 14-258.4. Each act was distinct in time and location. The first act involved Defendant spitting on Officer Locklear's forehead while Defendant was still in the house. The second act occurred five minutes later and involved Defendant spitting on Officer Locklear's arm after Defendant had been taken out of the house.

Furthermore, we believe the statute defining the crime of malicious conduct by prisoner is not ambiguous. The statute clearly states the elements necessary to constitute and complete the act of malicious

conduct by prisoner. Assuming the other elements are met, the definition of malicious conduct by prisoner allows for the crime to be complete when "the defendant thr[ows], emit[s], or cause[s] to be used as a projectile a bodily fluid or excrement at the victim[.]" *Noel*, 202 N.C. App. at 718, 690 S.E.2d at 13. Because there is no ambiguity in the statute defining malicious conduct by prisoner, and in accordance with the Supreme Court's holding in *Rambert*, we conclude that the trial court did not err by denying Defendant's motion to dismiss one of the charges of malicious conduct by prisoner.

## II: Motion for Appropriate Relief

**[2]** In Defendant's second argument on appeal, he contends the trial court erred in denying his motion for appropriate relief because the trial court erroneously allowed the juror, Mr. Diffendarfer, to testify about the effect of Ms. Elmore's statements on his mental processes and further erroneously took the foregoing testimony into account in denying Defendant's motion for appropriate relief.

"A motion for appropriate relief is a *post-verdict* motion (or a post-sentencing motion where there is no verdict) made to correct errors occurring prior to, during, and after a criminal trial." *State v. Handy*, 326 N.C. 532, 535, 391 S.E.2d 159, 160-61 (1990) (emphasis in orginal). Our standard of review from a trial court's denial of a motion for appropriate relief is well-established:

> When a trial court's findings on a motion for appropriate relief are reviewed, these findings are binding if they are supported by competent evidence and may be disturbed only upon a showing of manifest abuse of discretion. However, the trial court's conclusions are fully reviewable on appeal.

*State v. Lutz*, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (quotation omitted).

In his brief, Defendant raises the issue of extraneous evidence presented to the jury outside the courtroom, quoting N.C. Gen. Stat. §15A-1240(c)(1) which states the following:

> (c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns:
>
>> (1) Matters not in evidence which has come to the attention of one or more jurors under circumstances which would violate the defendant's

STATE v. HEAVNER

[227 N.C. App. 139 (2013)]

> constitutional *right to confront the witnesses against him*[.] . . .

*Id.* (emphasis added.)

When a motion asserting the right to a new trial is based on the violation of a constitutional right, "the ruling becomes a question of law, fully reviewable on appeal." *State v. Lyles*, 94 N.C. App. 240, 248, 380 S.E.2d 380, 395 (1989) (citation omitted). "Under North Carolina law, the violation of any right guaranteed by the United States Constitution is presumed to be prejudicial, and the *burden is then on the State* to show that it was harmless beyond a reasonable doubt." *Id.* (emphasis in original); *see also United States v. Bassler*, 651 F.2d 600, 603 (8th Cir. 1981) (stating that "[b]ecause Rule 606(b) precludes the district court from investigating the subjective effects of any extrinsic material on the jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice, a presumption of prejudice is created and the burden is on the government to prove harmlessness") (citations omitted).

> An error of constitutional magnitude will be held to be harmless beyond a reasonable doubt only when the court can declare a belief that there is no reasonable possibility that the violation might have contributed to the conviction. In the context of jury exposure to extraneous information, because inquiry into jurors' mental processes is prohibited, the test for determining harmlessness generally has been whether there was "no reasonable possibility" that "an average juror" could have been affected by it.

*Lyles*, 94 N.C. App. at 249, 380 S.E.2d at 396 (emphasis in original).

In *Lyles*, we laid out a factor test to assess whether the introduction of extraneous evidence is harmless beyond a reasonable doubt:

> In assessing the impact of the extraneous evidence on the mind of the hypothetical "average juror," the court should consider: (1) the nature of the extrinsic information and the circumstances under which it was brought to the jury's attention; (2) the nature of the State's case; (3) the defense presented at trial; and (4) the connection between the extraneous information and a material issue in the case.

*Id.* (citation omitted).

Although the trial court's order does not clearly identify its allocation of the burden of proof and fails to apply the proper analysis, most

of the findings of fact are not challenged by Defendant and are therefore binding on this court. We will therefore consider *de novo* whether these facts support a conclusion that the extraneous information was harmless beyond a reasonable doubt.

We agree with Defendant that the trial court should not have considered Mr. Diffendarfer's mental processes regarding the extraneous information. "Generally, once a verdict is rendered, jurors may not impeach it." *State v. Heatwole*, 344 N.C. 1, 12, 473 S.E.2d 310, 314 (1996), *cert. denied*, 520 U.S. 1122 (1997) (citation omitted). However, N.C. Gen. Stat. § 15A-1240 (2011), and N.C. Gen. Stat. § 8(c)-1, Rule 606(b) (2011), provide limited exceptions to the rule against impeachment of a verdict.

> Section 15A-1240 allows impeachment of a verdict only in a criminal case . . . [in situations where] matters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him. Rule 606(b) provides that when the validity of a verdict is challenged, a juror is competent to testify only "on the question [of] whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

*Heatwole*, 344 N.C. at 12, 473 S.E.2d at 314-15. We believe, in the case *sub judice*, that the conversation between Ms. Elmore and Mr. Diffendarfer was both "extraneous information" within the meaning of Rule 606(b) and a "matter not in evidence" that implicated Defendant's confrontation right within the meaning of N.C. Gen. Stat. § 15A-1240(c)(1). The trial court's findings of fact, as discussed in more detail below, reveal that Ms. Elmore did discuss Defendant's case, to some degree, with Mr. Diffendarfer. This, we believe, was "information dealing with the defendant [and] the case" being tried, which "reache[d] a juror without being introduced in evidence." *State v. Rosier*, 322 N.C. 826, 832, 370 S.E. 2d 359, 363 (1988).

Though N.C. Gen. Stat. § 8C-1, Rule 606(b) allows a juror to testify about the information that was improperly brought to his attention, this Court has held a juror may not testify as to how the information may have affected his verdict:

> Rule 606(b) plainly states that "*a juror may not testify as to . . . the effect of anything upon his or any other*

> *juror's mind* or emotions as influencing him to assent to or dissent from the verdict . . . *or concerning his mental processes* in connection therewith. . . ." Similarly, Section 15A-1240(a) provides that *"no evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes* by which the verdict was determined." Thus, it is clear that jurors may testify regarding the *objective events* listed as exceptions in the statutes, but are prohibited from testifying to the *subjective effect* those matters had on their verdict.

*Lyles*, 94 N.C. App. at 245-46, 380 S.E.2d at 394 (1989) (emphasis in original) (internal citations omitted). Defendant specifically argues on appeal that the trial court committed error by allowing Mr. Diffendarfer to testify about his mental processes in finding Defendant guilty and by considering Mr. Diffendarfer's testimony regarding his mental processes in its denial of Defendant's motion for appropriate relief.

The trial court's written order denying Defendant's motion for appropriate relief includes the following findings of fact:

> 10. That Roger Diffendarfer, juror, testified that he had not connected the Defendant with Janet Elmore, that it was a casual conversation, and that *it did not in any way affect his deliberations in the Defendant's case.*
>
> . . . .
>
> 12. That the testimony of the juror Roger Diffendarfer was believable, credible and unbiased; that he testified without emotion, and that his testimony was in stark contrast to that of Janet Elmore, who had reason to be biased for her son; further, that it is not credible that she would be so focused on her son that she would not notice said juror for two days.
>
> Based upon the foregoing the court finds that as a matter of law that there was no actual or potential prejudice to the Defendant.

(emphasis added). As evidenced in its findings, the trial court admitted and considered Mr. Diffendarfer's testimony that his conversation with

Ms. Elmore "did not in any way affect his deliberations in the Defendant's case." *See Lyles*, 94 N.C. App. at 245-46, 380 S.E.2d at 394. This was error.

Although it was error for the trial court to receive evidence about the subjective impact of the extraneous information on the juror, the other findings of fact are not challenged on appeal and are sufficient to support the trial court's conclusion. Applying the *Lyles* test here, based only upon the uncontested facts as found by the trial court and excluding any consideration of the juror's mental processes, there is no reasonable possibility that a juror could have been affected by the extraneous information.

The trial court specifically found Mr. Diffendarfer's testimony about the conversation between himself and Ms. Elmore credible. Mr. Diffendarfer testified that Ms. Elmore "said that [her son] was in trouble and she had come up from somewhere down south to support him, and that he had been in trouble some time before. And that was it. She never said what the trouble was." The juror further testified that Ms. Elmore never told him her son's name or what he had been charged with.

Ms. Elmore did testify to a more detailed and substantial conversation. Specifically, she testified that she told him the following:

> [I] was here from Florida to support my son, that he was accused of spitting on a police officer. I also told him that my son had been in trouble before, he had a record, and that – I told him several things about my son. To sum everything up, I told him that my son was a drug addict, he was an alcoholic, that he self mutilated. I told him a lot of things about my son.

Ms. Elmore also testified that she told Mr. Diffendarfer her son's name was Brent.

The trial court specifically found Mr. Diffendarfer's testimony regarding the content of the conversation credible and found Ms. Elmore's testimony not credible. The trial court specifically noted that it did not find Ms. Elmore's testimony credible because she had reason to be biased, and the trial court contrasted her demeanor with the unemotional testimony of Mr. Diffendarfer. Such determinations are the province of the trial court and not reviewable on appeal. *Nix v. Nix*, 80 N.C. App. 110, 115, 341 S.E.2d 116, 119 (1986); *Headen v. Insurance Co.*, 206 N.C. 860, 862, 175 S.E. 282, 283 (1934). In any event, Defendant has not challenged any of the trial court's findings regarding the content of the information or the manner of its presentation.

Based upon the findings which are not challenged on appeal, we conclude that there is no reasonable possibility that an average juror could have been affected by the extraneous information conveyed in the conversation Mr. Diffendarfer had with Ms. Elmore. As to the nature of the extrinsic information and circumstances under which the juror was exposed to this information, the findings show that the information was quite vague. According to the findings of fact, Ms. Elmore did not tell the juror any of the details of her son's case or even his name. Nothing she said was material to the issues in the case. As to the nature of the State's case, the evidence against Defendant was overwhelming. Defendant did not present any evidence at trial. There was no connection between the extraneous information and any issue, much less a material issue, in the case. Every factor as identified in *Lyles* clearly weighs against any prejudice to Defendant. Under these facts, there is "no reasonable possibility that the violation might have contributed to the conviction." *Lyles*, 94 N.C. App. at 249, 380 S.E.2d at 396. The State therefore met its burden of demonstrating that this error was harmless beyond a reasonable doubt. Therefore, we affirm the trial court's order denying Defendant's motion for appropriate relief.

NO ERROR.

Judge STEPHENS and Judge STROUD concur.